16 F.3d 1223
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert THOMAS, Defendant-Appellant.
 No. 91-80190.
 United States Court of Appeals, Sixth Circuit.
 Feb. 11, 1994.
 
 Before: MILBURN and BOGGS, Circuit Judges: and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant Robert Thomas appeals his jury convictions of one count of conspiracy to possess controlled substances with intent to distribute in violation of 21 U.S.C. Sec. 846 [Count 1], one count of possession of hydromorphone (dilaudid) with intent to distribute [Count 4], one count of possession of morphine sulphate (MS Contin) with intent to distribute [Count 5], one count of possession of codeine (Tylenol # 4) with intent to distribute [Count 6], one count of possession of codeine (Tylenol # 3) with intent to distribute [Count 7], one count of possession of glutethimide (Doriden) with intent to distribute [Count 8], one count of possession of diazepam (Valium) with intent to distribute [Count 9], and one count of possession of phentermine (Fastin) with intent to distribute [Count 10], all in violation of 21 U.S.C. Sec. 841(a)(1); and one count of maintaining a place for the distribution of controlled substances in violation of 21 U.S.C. Sec. 856 [Count 12].
 
 
 2
 On appeal, the issues are (1) whether the trial court erred when it allowed the government to use a prior inconsistent statement made by a co-defendant as evidence against the defendant, and (2) whether sufficient evidence was presented to support defendant's conviction of possession with intent to distribute controlled substances. For the reasons that follow, we affirm in part and reverse in part.
 
 I.
 A.
 
 3
 On March 14, 1991, a federal grand jury returned a nine-count indictment against defendant Thomas and various other co-defendants including Stanley Pickens. The grand jury returned a superseding indictment on January 7, 1992. In Count 1 of the superseding indictment, defendant was charged with conspiracy to distribute prescription controlled substances. Counts 4 through 10 charged defendant with possession of various controlled prescription drugs with intent to distribute. Count 11, which was dismissed during the trial, charged defendant with aiding and abetting the distribution of controlled substances. In Count 12, defendant was charged with maintaining a place for the distribution of controlled substances.
 
 
 4
 On April 5, 1991, defendant Thomas was arraigned on the indictment; he was arraigned on the superseding indictment on January 21, 1992. A jury trial commenced on July 23, 1992. At the end of all the proof on July 24, 1992, defendant moved to dismiss all the charges against him; the motion was denied. Jury deliberations began on July 27, 1992. That same day, the jury returned a verdict on all the charges pending against defendant. Subsequently, defendant filed a written motion to dismiss the charges in Counts 1, 4, 5, 6, 7, 8, and 9, which was denied by the district court.
 
 
 5
 Defendant was sentenced on December 1, 1992, to a term of 50 months incarceration on each of Counts 1, 4, 5, 6, 7, 8, and 12, with the sentences to run concurrently. On Counts 9 and 10, defendant was sentenced to a term of 36 months incarceration on each count of conviction, with the sentences to run concurrently to each other and to all the other sentences imposed. This timely appeal followed.
 
 B.
 
 6
 Defendant Thomas managed a "pill house" at 4150 Lovett, Detroit, Michigan, property which he owned. Defendant illegally purchased prescription controlled substances and attempted to shield himself from liability for the illegal resale of the prescription drugs by hiring others to sell the drugs from the Lovett address.
 
 
 7
 On November 21, 1990, Special Agent Michael Nussbaum of the Drug Enforcement Administration went to 4150 Lovett and purchased 20 Soma tablets from Thomas' co-defendant, Stanley Pickens, who was known as "Railroad." At that time, Agent Nussbaum learned that defendant Thomas owned the property at 4150 Lovett.
 
 
 8
 Thereafter, on November 29, 1990, Agent Nussbaum returned to 4150 Lovett and purchased a quantity of Doriden and Tylenol # 4 from co-defendant Pickens. On January 10, 1991, Agent Nussbaum again went to the "pill house" and purchased fifteen Dilaudid tablets from Pickens.
 
 
 9
 During the investigation, Agent Nussbaum also kept the "pill house" under periodic surveillance and noticed activity which was consistent with drug trafficking. Specifically, he noted that various persons would come to the "pill house," remain for a short time and then leave. On other occasions, people drove up to the curb outside the "pill house," and they would be approached by persons from inside the "pill house." After a short conversation, they would drive away. On some of these occasions, Agent Nussbaum observed defendant Thomas at the 4150 Lovett address. However, Agent Nussbaum also admitted that he did not observe defendant Thomas' engaging in any illegal activity.
 
 
 10
 On March 6, 1991, agents executed a search warrant at 4150 Lovett. Various prescription drugs, which were controlled substances, were seized from the "pill house" including Doriden, Tylenol # 3, Tylenol # 4, Morphine Sulphate, and Valium. The agents also seized Soma, as well as some noncontrolled substances, such as Ampicillin and Penicillin.
 
 
 11
 In April 1991, Katherine Chaney, a Drug Enforcement Diversion Investigator, began investigating the fact that an excessive amount of prescription drugs that were controlled substances were being ordered by the offices of a Dr. Goodman, a dentist in the Detroit metropolitan area. Investigator Chaney's investigation was entirely separate from Agent Nussbaum's investigation, and it commenced as the result of a telephone call from a local drug distributor, Great Lakes Wholesale, informing the DEA that there were excessive and suspicious orders for controlled substances coming from Dr. Goodman's office. Eventually, Investigator Chaney learned that Charles Roberts and LaVerne Williams, an employee in the dentist's office, were responsible for ordering thousands of Tylenol # 3 and # 4, Soma, and Valium, which were then sold to an individual known as B.T. B.T. was eventually identified as defendant Thomas. Further, Roberts and Williams were eventually arrested by the DEA after the government set up surveillance at Dr. Goodman's office and they received and accepted a controlled delivery of a shipment of prescription drugs.
 
 
 12
 Thereafter, Roberts and Williams began cooperating with the government. Roberts and Williams told the DEA that they sold the prescription drugs to individuals at various places including the house at 4150 Lovett. At trial, Charles Roberts testified, pursuant to a plea agreement, that he first met defendant Thomas at the Lovett address in February 1991, through his uncle. Roberts stated that on numerous occasions he sold Tylenol # 4 to Thomas for $1.00 each and Tylenol # 3 and Valium for $0.75 each. According to Roberts, LaVerne Williams was present with him during some of these drug sales and assisted him. Roberts testified that these drug transactions often occurred in a vacant lot next to the Lovett Street house. Roberts stated that there were several abandoned cars on the vacant lot and that he would place the drugs in one of the abandoned cars rather than give them directly to defendant Thomas. Roberts also testified that on some of these occasions he observed sales of pills to customers taking place from the house on Lovett. However, although Roberts testified that he had been inside the "pill house," he also testified that he had never made a drug sale inside the house, and he was unable to give a specific date on which he had made a drug sale to defendant Thomas.
 
 
 13
 LaVerne Williams, the fiancee of Charles Roberts, also testified pursuant to a plea agreement. She testified that she ordered controlled substances using the DEA number of Dr. Goodman. She testified that she then turned the drugs over to Roberts who was responsible for selling them. Ms. Williams testified that she and Roberts sold Tylenol # 3, # 4, and Valium to defendant Thomas. Williams also testified that although she attempted to obtain Dilaudid and Doriden, she was unable to do so. Williams, like Roberts, was unable to name a specific date on which she assisted Roberts in a drug transaction with defendant Thomas; however, she did remember that she assisted Roberts by counting out pills by the hundreds and placing them in a bag.
 
 
 14
 Defendant Thomas' wife also testified at trial. She testified that defendant lived with her at an address on Coyle Street in Detroit. She stated that defendant worked for Ford Motor Company and owned the house at 4150 Lovett, which he rented to various tenants. She also testified that her husband owned the property next door to the house at 4150 Lovett, upon which he operated a towing company.
 
 
 15
 Co-defendant Pickens testified on his own behalf. On cross-examination, Pickens admitted that defendant Thomas was often present at the Lovett address and would stay overnight. Pickens also admitted that the people at the Lovett address called him "Railroad." Pickens denied any involvement in, or knowledge of, drug sales at the Lovett address. On direct examination, Pickens denied ever selling drugs to Agent Nussbaum, and on cross-examination, Pickens then denied that, following his arrest, he had told Agent Nussbaum that he had sold drugs. Likewise, Pickens also denied telling Agent Nussbaum that defendant Thomas was in charge of buying and selling drugs.
 
 
 16
 Agent Nussbaum testified in rebuttal. He testified that following his arrest, Pickens admitted knowing that there were drug sales at the Lovett address and stated that Thomas was in charge of the transactions. During Agent Nussbaum's testimony, the following colloquy occurred:
 
 
 17
 A. That's when we went to Ford Motor Company and arrested Mr. Pickens.
 
 
 18
 Q. And did you place him under arrest?
 
 
 19
 A. Yes, I did.
 
 
 20
 Q. Was he read his rights?
 
 
 21
 A. Yes he was.
 
 
 22
 Q. And did he give a statement?
 
 
 23
 A. Yes, he did.
 
 
 24
 Q. What'd he tell you?
 
 
 25
 Defense Counsel: Your Honor, I'm gonna have to object as to any statement that related to my client, if any of it does.
 
 
 26
 U.S. Att'y: That--this goes to the credibility of--he made the statement; he was allowed to cross-examine Mr. Pickens on that, so the Bruton problem is gone at this point, and so now it's a matter of the credibility and I'm allowed to ask questions as to the credibility of Mr. Pickens, given that he's contradicted a statement he made earlier.
 
 
 27
 Defense Counsel: He can do it as to Mr. Pickens, but not as to my client. It still cannot come in as to my client.
 
 
 28
 U.S. Att'y: I believe it can, Your Honor, because he's now had the opportunity to cross-examine Mr. Pickens. He had that--he had the choice to cross-examine him, to ask any questions if he wanted on that. That's how Bruton disappears, and he gave up that chance and he cannot now prevent me from attacking that credibility.
 
 
 29
 The Court: overruled.
 
 
 30
 * * *
 
 
 31
 Q. Did Mr. Pickens make a statement?
 
 
 32
 A. Yes, he did.
 
 
 33
 Q. What did he tell you?
 
 
 34
 A. Mr. Pickens told me that he knew an individual named B.T., Robert Thomas, and that Mr. Pickens stated he in fact lived at 4150 Lovett.
 
 
 35
 Q. OK. Did he tell--did he admit to any drug sales?
 
 
 36
 A. No.
 
 
 37
 Q. Did he tell you anything about a nickname?
 
 
 38
 A. Yes, he said that the people at that address were the ones that nicknamed him Railroad.
 
 
 39
 Q. And what did he tell you about Mr. Thomas?
 
 
 40
 A. He told me that Mr. Thomas was in charge of buying and selling prescription pills and narcotics out of that house, at 4150 Lovett.
 
 
 41
 Q. Did he tell you anything about the ownership of any pills?
 
 
 42
 A. He state--also stated that Mr. Thomas was the owner of that house.
 
 
 43
 Trial Tr., Vol. 2, pp. 181-83.
 
 
 44
 It is undisputed that the district court did not give a cautionary instruction to the jury informing them that Agent Nussbaum's testimony could be considered for impeachment purposes only and not as substantive evidence against defendant Thomas.
 
 II.
 A.
 
 45
 Defendant Thomas argues that there was insufficient evidence to support his convictions of possession with intent to distribute in Counts 4 through 10 of the indictment. In its brief on appeal, the government concedes that there was insufficient evidence to convict defendant on Count 4, possession of Dilaudid, and that the conviction on that count should be reversed. Therefore, defendant's conviction on Count 4 shall be reversed. However, the government contends that sufficient evidence exists to support defendant's remaining convictions of possession with intent to distribute.
 
 
 46
 In determining the sufficiency of the evidence to support a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential element of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). If the evidence is sufficient to justify a reasonable juror's conclusion that each element of the offense has been established beyond a reasonable doubt, the convictions will be affirmed. Id.
 
 
 47
 In this case, when the evidence is viewed in the light most favorable to the government, sufficient evidence was presented to sustain the jury's guilty verdicts as to all of the remaining convictions for possession with intent to distribute controlled substances. To convict a defendant of possession with intent to distribute, a jury must find that there was a (1) knowing (2) possession of a controlled substance (3) with intent to distribute. United States v. Christian, 786 F.2d 203, 210 (6th Cir.1986).
 
 
 48
 In this case, it is undisputed that defendant Thomas owned the property at 4150 Lovett. Moreover, there was testimony that Thomas was often present on the property. Further, Charles Roberts and LaVerne Williams testified that they sold prescription drugs which they had obtained to defendant Thomas either on the property at 4150 Lovett or on the adjacent vacant lot. Roberts and Williams also testified that they witnessed sales of pills taking place on the property at 4150 Lovett while they were selling drugs to Thomas.
 
 
 49
 In addition, DEA Agent Nussbaum made several purchases of prescription drugs, and he kept the house under periodic surveillance and observed numerous drug transactions occurring there. Furthermore, the types of drugs purchased by Thomas were the types of drugs seized from the "pill house" when the search warrant was executed on March 6, 1991.
 
 
 50
 Thus, from the evidence as a whole, a reasonable juror could find that Thomas maintained control of the property at 4150 Lovett, was aware that drug transactions were taking place on the property, and was involved in and responsible for the drug transactions which were occurring at the "pill house." Viewing the evidence in the light most favorable to the government and taking all reasonable inferences therefrom, a rational juror could find beyond a reasonable doubt that defendant Thomas exercised control over the drugs at the "pill house" with the intent that such drugs be distributed. Accordingly, we conclude that sufficient evidence exists to affirm defendant Thomas' convictions on counts five through ten, possession of various controlled substances with intent to distribute.
 
 B.
 
 51
 Defendant argues that the district court erred when it permitted the government to use a prior inconsistent statement made by a testifying co-defendant, Stanley Pickens, against the defendant. Specifically, defendant asserts that the district court committed plain error when it failed to limit the use of Pickens' prior inconsistent statement to impeachment purposes only, rather than as substantive evidence.
 
 
 52
 In this case, defendant did not object to the out-of-court statement of co-defendant Pickens on the grounds that it could only be used for purposes of impeachment, nor did he request a limiting instruction to that effect. Thus, we review the district court's failure to give a limiting instruction for plain error.
 
 
 53
 Federal Rule of Criminal Procedure 52(b) is the applicable rule which governs our review for plain error. Under Rule 52(b), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In United States v. Olano, 113 S.Ct. 1770 (1993), the Supreme Court has recently set forth the considerations for an appellate court's making a plain error review. First, we must determine whether an error occurred in the district court. Id. at 1777. Absent any error, our inquiry is at an end. However, if an error occurred, we must then consider if the error was plain. Id. If it was plain, then we proceed to inquire whether the plain error affects substantial rights. Id. at 1777-78. Finally, even if the other inquiries are satisfied, we must still consider whether to exercise our discretionary power under Rule 52(b), or in other words, we must decide whether the plain error affecting substantial rights seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Id. at 1779.
 
 
 54
 In this case, it is undisputed by the parties that the district court's failure to give a limiting instruction to the jury concerning Pickens' testimony was an error which constituted plain error. "It is well settled in this [circuit] that it is error not to give a requested instruction limiting consideration by the jury of an out-of-court statement to impeachment purposes." United States v. Dye, 508 F.2d 1226, 1235 (6th Cir.1974), cert. denied, 420 U.S. 974 (1975). Further, "[i]n this circuit, failure to give a limiting instruction with respect to the use of extra-judicial statements is plain error" under Rule 52(b). Id.
 
 
 55
 Under Rule 52(b), for a plain error to affect substantial rights, "the error must have been prejudicial: It must have affected the outcome of the District Court proceedings." Olano, 113 S.Ct. at 1778. Where a defendant makes a timely objection to the error, courts of appeals normally engage in a harmless error inquiry under Rule 52(a) to determine whether the error was prejudicial. Id. "Rule 52(b) normally requires the same kind of inquiry, with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice. In most cases, the Court of Appeals cannot correct the forfeited error unless the defendant shows that the error was prejudicial." Id.
 
 
 56
 Thus, we must review the record to determine whether the district court's failure to give a limiting instruction was harmless error. This court has adopted two different harmless error standards. First, "[w]here an error is not of constitutional dimension, it is harmless unless it is more probable than not that the error materially affected the verdict." United States v. Martin, 897 F.2d 1368, 1372 (6th Cir.1990) (citing United States v. Neuroth, 809 F.2d 339, 342 (6th Cir.) (en banc), cert. denied, 482 U.S. 916 (1987)). However, if the error was of federal constitutional magnitude, it "can be held harmless only if the Court is able 'to declare a belief that it was harmless beyond a reasonable doubt.' " Martin, 897 F.2d at 1372 (quoting Chapman v. California, 386 U.S. 18 (1967)).
 
 
 57
 In this case, the error on the part of the district court, even in the absence of a specific objection or a request by the defendant, was the failure to give a limiting instruction to the jury. This error is similar to errors which concern such matters as the admissibility of evidence, jury instructions, and comments of counsel to which the "more probable than not" standard has generally been applied. United States v. Valle-Valdez, 554 F.2d 911, 916 (9th Cir.1977). Traditionally, the courts have viewed as 'constitutional errors' those errors violating specific provisions of the Bill of Rights such as the self-incrimination clause, the confrontation clause, and the exclusionary rule based on the Fourth Amendment prohibition against unreasonable searches." Id. (citations omitted). Thus, we conclude that the more probable than not standard applies here.
 
 
 58
 Using the more probable than not standard, we conclude that the district court's failure to give a limiting instruction to the jury was harmless error. The principal evidence against defendant Thomas was the testimony of his two alleged accomplices or co-conspirators, Charles Roberts and LaVerne Williams. Both Roberts and Williams testified that they sold substantial quantities of prescription drugs that were controlled substances to defendant Thomas in the empty lot next door to 4150 Lovett. Further, Roberts and Williams also testified that they witnessed sales of pills taking place on the property at 4150 Lovett while they were selling drugs to Thomas.
 
 
 59
 In addition, defendant Thomas owned the property at 4150 Lovett, and there was testimony that Thomas was often present on the property and, on occasion, stayed there. Further, government agents, including DEA Agent Nussbaum made several purchases of prescription drugs at the house on 4150 Lovett, and while the house was under periodic surveillance, numerous drug transactions were observed there. Lastly, some of the drugs seized at 4150 Lovett when the bench warrant was executed on March 6, 1991, were the types of drugs which Roberts and Williams testified that they sold to Thomas on the vacant lot next to the "pill house."
 
 
 60
 From this evidence and without the prior inconsistent statement of co-defendant Pickens, as testified to by Agent Nussbaum, the jury would very likely have concluded that defendant Thomas was aware that drug transactions were occurring at 4150 Lovett; was involved in procuring drugs for those transactions; and, indeed, maintained the house at 4150 Lovett, along with the adjacent vacant lot where he procured the drugs for the purposes of selling the illegally obtained prescription drugs.
 
 
 61
 Therefore, we conclude that defendant has not met his burden of showing that he was prejudiced by the district court's failure to give a limiting instruction to the jury concerning co-defendant Pickens' prior inconsistent statement. Defendant has failed to show that it is more probable than not that the district court's failure to give a limiting instruction contributed to his convictions. Thus, we reiterate that the district court's failure to give a limiting instruction was harmless error.
 
 
 62
 The final prong of the Olano test is whether this court should exercise its discretion under Rule 52(b) to correct the forfeited error. Olano, 113 S.Ct. at 1778. "The Court of Appeals should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings.' " Id. (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)). Since we have concluded that the district court's failure to give a limiting instruction to the jury was harmless error which did not prejudice defendant's substantial rights, the Olano test has not been satisfied. Thus, this court is precluded from exercising its discretion under Rule 52(b) to correct the plain error.
 
 III.
 
 63
 For the reasons stated, defendant's conviction on Count 4, possession of dilaudid with intent to distribute, is REVERSED, and all of defendant's remaining convictions are hereby AFFIRMED.